**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| VANESTA THOMPSON, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 1:10-CV-652-SEB-DKL |
| ) | |
| STEVE McCAULEY, Superintendent, ) | |
| ) | |
| Respondent. ) | |

**Entry Discussing Petition for Writ of Habeas Corpus**
**and Denying Certificate of Appealability**

For the reasons explained in this Entry, the petition of Vanessa Thompson for a writ of habeas corpus is **denied** and this action is **dismissed with prejudice**. In addition, the court finds that a certificate of appealability should not issue.

**I. Background**

The evidence favorable to the jury's verdict shows that Vanessa Thompson murdered 16-year-old Shanna Sheese.[1] Thompson's conviction was affirmed on direct appeal in *Thompson v. State*, 765 N.E.2d 1273 (Ind. 2002) (*Thompson I*). The trial court's denial of Thompson's petition for post-conviction relief was affirmed on appeal in *Thompson v. State,* 905 N.E.2d 68 (Ind.Ct.App. April 16, 2009) (unpublished)(*Thompson II)*. Thompson's petition for transfer to the Indiana Supreme Court was denied. In *Thompson II*, the Indiana Court of Appeals set forth the facts of Thompson's offense as follows:

> On October 19, 1998, the body of sixteen-year-old Shanna Sheese was discovered in a vacant lot on the near eastside of Indianapolis. A pathologist concluded that Sheese had been struck in the head at least three or four times by a heavy object "that was relatively flat but could have been slightly curved" and that these blows caused Sheese's death. *Transcript of Trial* at 341. At the time her body was discovered, Sheese had been dead for at least two days and possibly as long as three or four days.

---

[1] Thompson was originally charged along with Alexa Whedon and Malcolm Wilson for the murder of Sheese. Each defendant was tried separately following severance upon motion of the State. Whedon was convicted in November 1999 and Wilson was convicted in March 2000. Their convictions were affirmed on appeal.

After a series of interviews over the next several months, the lead detective in the case, Roy West, began focusing his investigation on Thompson; her girlfriend, Alexa Whedon; and her boyfriend, Malcolm Wilson. The information gleaned from these interviews suggested the three murdered Sheese either because Thompson was angry at Sheese for having had sex with Wilson or because Sheese had not paid Wilson for crack cocaine she purchased from Thompson, who sold the drugs on Wilson's behalf. Based on this information, on March 2, 1999, the State charged Thompson with murder, a felony.

From September 18 to 20, 2000, the trial court presided over a jury trial. Because there was an absence of physical evidence linking Thompson to Sheese's murder, the State attempted to prove Thompson's guilt primarily through the testimony of four witnesses: Susan Miller, Davida Altmeyer, Pamela Nave, and Gail Davis. With the exception of one observation by Altmeyer discussed below, the testimony of Miller and Altmeyer concerned incriminating statements made by Thompson around the time Sheese's body was discovered. Specifically, Miller testified she was discussing Sheese's death with Whedon at an acquaintance's house when Thompson entered and told Whedon she "shouldn't be talking about things in front of other people." *Id.* at 277. According to Miller, Thompson then stated that she was glad Sheese was dead and that Sheese "shouldn't have fucked with Malcolm." *Id.*

Altmeyer testified that on one night around the time Sheese's body was discovered, she was walking toward Wilson's truck to purchase crack cocaine from him. As she approached, Altmeyer observed a pair of white tennis shoes in the truck's bed that were similar to those she had seen Sheese wearing. Altmeyer thought the shoes were attached to a body, but she was not certain because a tarp covered most of the bed. At that point, Thompson, who had been sitting in the passenger seat of the truck, pulled the tarp over the shoes and said, "She saw, she saw," to which Wilson replied, "No she didn't cause if she says anything, we know where it came from." *Id.* at 297. Altmeyer also testified that at an unspecified time at her mother's house, Thompson told Altmeyer that she struck Sheese on the head, that the blow rendered Sheese unconscious, and that Wilson helped her dispose of Sheese's body.

The testimony of Nave and Davis concerned incriminating statements Thompson made to them while Thompson was confined at the Marion County Jail. Specifically, Nave testified Thompson stated she "had hurt somebody really bad for [Wilson] and that she would kill for him."

> *Id.* at 396. Davis's testimony was more explicit; she testified that one night when she and Thompson were in bed together, Thompson stated she "crushed [Sheese's] head in with a brick" because Wilson told her to "get rid of the girl." *Id.* at 466. According to Davis, the following then occurred: "She was just looking up and she asked me, [']did I know what it was like to kill someone[?'] and then she told me how warm the blood was—how the blood was warm on her hands and how she would never forget that." *Id.* at 468.
>
> The jury found Thompson guilty, and the trial court entered a judgment of conviction based on the jury's finding. Our supreme court affirmed Thompson's conviction on direct appeal. *Thompson*, 765 N.E.2d at 1276.

*Thompson II*, 905 N.E.2d 68 at *1-2.

Thompson now seeks from this court a writ of habeas corpus. Thompson claims that: (i) she was denied the effective assistance of counsel at trial; (ii) the prosecutor withheld from her and her attorney three letters received by the prosecutor from a major state's witness which contained information that would have cast material doubt as to the reliability of that witness and the strength of the State's case; (iii) the prosecutor drew upon the witness's testimony which he should have known was false, without apprising the defense of the witness's dishonesty and claiming that the witness was motivated by altruistic concerns; (iv) the prosecutor did not inform her that certain informant witnesses received lenient consideration in their criminal sentencings; and (v) the prosecutor failed to correct Detective West's testimony regarding benefits given or shown to the informant witnesses.

The three letters were all written by Gail Davis. The first letter was written to Stanley Kroh[2] during Davis's four-month (February 5 through June 21, 1999) confinement at the Marion County Jail. The first letter ("first letter") states as follows:

> Mr. Stanley Kroh,
>
> This is Gail Davis from the Marion County Jail. The last we spoke, I asked you to contact Jail Records and take Renee Vigil/Desiree Padilla's name off my card and my name off her card. Because of this Murder Trial I agreed to testify for. My wife's and my life for the moment is chaos. The officers are not letting us go to <u>any</u> classes, church, school, recreation or just any contact at all. You said you would take care of this by going to jail records. Well the officers say that the

---

[2] Kroh was the State's deputy prosecutor.

>cards have not changed. I have tried writing to jail records and everything I can think of and all to no avail. My wife (Renee Vigil/Desiree Padilla) has less than 2 wks. in jail and I would like to spend at least a few days with her before she leaves. We don't know when we'll see each other again. If you could give officer Lowe a phone call and tell her about the situation, she said she would except [sic] that from you or a call from Jail Records to update our cards. Please Mr. Kroh I really need your help ASAP.
>
>Sincerely,
>Gail Davis
>Gayle Davis
>#521372
>
>Renee Vigil
>#499785

The second and third letters were written after Whedon's trial in November 1999 but before the originally scheduled date of Thompson's trial in December 1999. The second letter ("second letter") states as follows:

>To whom it may concern:
>
>I am writing to plead to you to take me back to Rockville today. I do not think I will be able to come back here in Dec for the 2nd trial.
>
>The conditions here are too much for me to handle. I have been here for 5 days and in that time I have not eaten. I am *very* hungry. I am paranoid about the food. The showers have nets and bugs and it is filthy and the laundry smells. This block is so loud I can't think. The women are having open sex and the air smells pretty bad. Chaos is 24 hrs a day.
>
>I am a phyic [sic] patient as you well know and I have been given the wrong medication and for the past few days no medication at all.
>
>I only have 27 days til my release date and I don't want to do them under these conditions. Sorry this place is unbearable.
>
>Gail Davis

The third letter ("third letter") states as follows:

> The Prosecutors Office, Stanley Kohn or whom it may concern:
>
> I Gail Davis withdraw my testimony in the case against Vanessa Thompson. I will not testify for the State of Indiana for or against her.
>
> I do not want to be transported from Rockville Correctional Facility to be involved in this case what so ever. I will not speak in this trial.
>
> I have been treated and subjected to unspeakable conditions while testifying against Alexia Wheton.
>
> It has been over a week now and I have had no medication for my disorder and I am beginning to manic out. I have had no food, nor do I have a change of clothing or hygienes.
>
> I was *promised* I would be taken back to Rockville after the trial Tuesday Nov. 23rd and here it is Friday Nov. 26th and I am still here at the Marion County Jail. I was promised I would not spend the Thanksgiving holiday here yet here I sit. The showers have mold, nets and bugs, and I can not take these conditions.
>
> I feel used and abandoned by the prosecutors office. I have done nothing but cooperate even when it has inconvenienced. I will not be treated this way again therefore I will not testify in the trial against Vanessa Thompson. I am very angry, disappointed and hurt. I have never lied during this investigation and do not appreciate being lied to.
>
> I wish you nothing but the best and may justice prevail.
>
>  May God bless you all.
>
> Gail Davis
>
> It is now Tuesday Nov. 30 1999 that I mail this letter. I am still here at Marion County Jail.
>
> Gail Davis (emphasis in original)

## II. Applicable Law

In the exercise of habeas jurisdiction, a federal court may grant relief only if the petitioner shows that he is in custody "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a). When a habeas petition is filed after enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) on April

24, 1996, that Act's restrictions on federal review of state court rulings apply to the case. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Henderson v. Walls*, 296 F.3d 541, 545 (7th Cir. 2002).

> AEDPA provides that if a constitutional claim was adjudicated on the merits by the state courts, a federal court may only grant habeas relief based on that claim if the state court's decision was "contrary to" or an "unreasonable application of" federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1), or if the state court's determination of the facts was unreasonable in light of the evidence presented. *See id.* at § 2254(d)(2).

*Williams v. Davis,* 301 F.3d 625, 631 (7th Cir. 2002).

With regard to the law governing § 2254(d)(1), "contrary to" established Supreme Court precedent means "substantially different from the relevant precedent." *Boss v. Pierce,* 263 F.3d 734, 739 (7th Cir. 2001), *cert. denied*, 122 S.Ct. 1961 (2002)*.* "For example, a state court decision applying a rule that contradicts the governing law . . . would qualify . . . [or] a decision that involves a set of facts materially indistinguishable from a Supreme Court case that arrives at a different result." *Id.* (citing *Williams v. Taylor,* 529 U.S. at 405-06).

A state court decision is an "unreasonable application" of federal law under § 2254(d)(2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413.  The reasonableness of the state court's application of federal law is to be evaluated by an objective standard. *See id.* at 409-10. The Supreme Court has cautioned:

> [i]n § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411. Furthermore, the Supreme Court has recently explained,

> If [the §2254(d)] standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the

>  state court's decision conflicts with this Court's precedents. It goes no
>  farther.

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal citation and parenthetical citation omitted). "For purposes of reasonableness review, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012)(quoting *Harrington* at 786-87). Factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts v. Vaughn,* 228 F.3d 178, 196 (3d Cir. 2000) (*citing* 28 U.S.C. § 2254(e)(1)), *cert. denied*, 532 U.S. 980 (2001). This is a "rigorous burden of proof." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999), *cert. denied*, 529 U.S. 1089 (2000).

## III. Discussion

### A. Assistance of Trial Counsel

Thompson contends that she was denied the effective assistance of counsel at trial. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington,* 466 U.S. 668, 684 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To support an ineffective assistance of counsel claim under *Strickland,* Thompson must show: (1) that counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 695. A failure to establish either prong would result in a denial of Thompson's claim. *See Rastafari v. Anderson,* 278 F.3d 673, 688 (7th Cir. 2001). The first prong is satisfied by a showing that counsel's performance fell below the "objective standard of reasonableness" guaranteed under the Sixth Amendment. *Barker v. United States,* 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 688). In evaluating whether counsel's performance was deficient, "the court must defer to counsel's tactical decisions," avoid "the distorting effects of hindsight" and give counsel the benefit of a strong presumption of reasonableness. *Strickland*, 466 U.S. at 689; *Holman v. Gilmore,* 126 F.3d 876, 881-82 (7th Cir. 1997). The prejudice prong of *Strickland* requires Thompson to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Thompson's specific contention regarding the representation of her trial attorney is that her attorney did not impeach Gail Davis with Davis's prior inconsistent statement that would have called into question her credibility as a witness.[3] In addressing this issue, the Indiana Court of Appeals properly recognized the *Strickland* standard as controlling and did not apply a contrary standard. *Thompson II*, at 22. Thus, the "contrary to" prong for habeas relief is foreclosed, per 2254(d)(1). The Indiana Court of Appeals determined that even assuming that counsel's failure to impeach Davis constituted deficient performance, Thompson was not prejudiced. The Indiana Court of Appeals agreed with the findings of the post-conviction court that Davis's statement may actually have strengthened the prosecution. *Id.*, at 23.

In addition, Thompson failed to rebut by clear and convincing evidence any of the factual findings reached by the Indiana Court of Appeals in connection with the resolution of her claim of ineffective assistance of counsel at trial. This eliminates the possibility of relief under the "unreasonable facts" prong of § 2254(d)(1) as well as under § 2254(d)(2), leaving for our consideration whether Thompson has shown that the Indiana Court of Appeals's resolution of her ineffective assistance of counsel at trial was an unreasonable application of clearly established Supreme Court precedent, pursuant to the remaining prong of § 2254(d)(1).

> When faced with the task of determining whether a particular application of Supreme Court precedent is unreasonable, we have often taken a more pragmatic approach to answering the question, scrutinizing the practical operation and effect of the principles at issue in the particular facts of the case. *See, e.g., Miller v. Anderson*, 255 F.3d 455, 456-59 (7th Cir. 2001); *Redmond v. Kingston*, 240 F.3d 590, 591-92 (7th Cir. 2001); *Washington v. Smith*, 219 F.3d 620, 627-35 (7th Cir. 2000). We ask whether the decision is "at least minimally consistent with the facts and circumstances of the case" or "if it is one of several equally plausible outcomes," *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997), granting a writ of habeas corpus if the determination is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary" as to be unreasonable. *Hall*, 106 F.3d at 749.

---

[3] Footnote 1 of Thompson's reply states that her other ineffective assistance of counsel claim regarding the prosecutor's improper vouching statements is addressed in the context of Thompson's prosecutorial misconduct claims because the prosecutor had not disclosed the information to Thompson's attorney.

*Boss v. Pierce,* 263 F .3d 734, 741-42 (7th Cir. 2001).

In addition to the "deficient performance" prong of *Strickland,* as we have noted previously, to prevail on this claim Thompson must also show prejudice. This means establishing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which in turn means, in this context, that there is a reasonable probability that, but for counsel's omissions, Davis would have been impeached with a prior statement and would have jeopardized the state's theory that Thompson struck the victim with a brick.

The Indiana Court of Appeals satisfied these requirements in concluding that prejudice had not been shown and in upholding the judgment(s) of the lower court:

> the statement appears fairly consistent with Davis's trial testimony in that both describe the murder weapon and the manner in which Sheese was killed. Thompson attempts to sidestep this finding by contending that Davis's reference to a "visual" is proof she was suffering from hallucinogenic thinking and fantasized her conversation with Thompson. Yet Thompson offers no evidence to support this contention, and in the absence of such evidence, we cannot say counsel's assumed deficiency resulted in prejudice, let alone conclude the post-conviction court clearly erred in that regard.

*Thompson II,* at p. 23. We find no legal basis on which to undermine or reverse this application of *Strickland's* prejudice prong as objectively unreasonable. Thus, no relief under § 2254(d)(1) is available on habeas review.

## B. Prosecutorial Misconduct

Thompson's next set of claims relates to witnesses' testimony; she contends that the prosecutor: (i) withheld from Thompson and her attorney three letters received from a major state's witness, which contained information that would have cast material doubt on the reliability of the witness and the integrity of the State's case; (ii) drew on the witness's testimony, which he should have known was false, and did not apprise the defense of the witness's dishonesty, claiming that the witness was motivated only by altruistic concerns; (iii) did not inform Thompson that two witnesses received lenient consideration in their own criminal sentencing; and (iv) failed to correct Detective West's testimony regarding benefits given or shown to the informant witnesses.

As for Thompson's claim that the prosecutor withheld from her and her attorney three letters of material value, Thompson characterizes this as *Brady* information, a reference to *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*,

the suppression of exculpatory evidence by the prosecution violates a defendant's right to due process. Thompson characterizes the information regarding the three letters written by Gail Davis as having the effect of casting material doubt on this witness's credibility and muddying the state's case. These letters, she maintains, could arguably have shown the witness's efforts to secure benefits from the prosecution in exchange for her testimony. As such, they qualify as *Brady* material. For purposes of the present analysis, we will treat them as *Brady* material which the State had a duty to disclose to Thompson but failed to do so. In review of Davis's letters, the Indiana Court of Appeals held:

> We conclude the first letter could have been used to impeach Davis's testimony that she never requested favors and to argue that the State attempted to accommodate her request, but not to impeach Davis's testimony that she actually received the requested favor from the State. Regarding the second and third letters, we conclude they could have been used to strengthen the defense's theory that Davis experienced delusional thoughts in the absence of medication and to impeach Davis's testimony that she denied threatening not to testify if she was not transferred quickly to Rockville Correctional Facility.

*Thompson II*, at p. 14.

At the post-conviction hearing, when Detective Kroh was asked about the first letter containing Davis's request, he explained that "[e]ither myself or Sergeant West, I believe, may have talked to jail records about that" and "if she had asked us to do that, we would have looked into it if those people were still there."(PCR Part I, p. 60). Regarding the second letter in which Davis requested that she be returned to Rockville Correctional Facility as quickly as possible after testifying at Alexa Whedon's trial, Kroh admitted that "[y]es, as with any defendant that's in custody of the Department of Correction, yes, I would have done that" and "she didn't like the conditions at the Marion County Jail, and we would tell her that, yes, we would put an order in, and the practice was to get a transport order in as soon as possible." (PCR Part I, p. 61). Kroh admitted that following the receipt of the third letter, "Sergeant West and (he) traveled to Rockville to talk with her" because "[w]e were concerned that she decided that she did not want to testify." (PCR Part I, p. 62).

The post-conviction court nonetheless ruled that the letters did not satisfy the materiality test under *Brady.* In reviewing that decision, the Indiana Court of Appeals affirmed the post-conviction court's decision, ruling as follows:

> We are skeptical the letters would have significantly impacted the trial to the extent they were used to impeach Davis's testimony that she never requested favors from the State and that she denied threatening not to testify unless she received a quick transfer to Rockville

> Correctional Facility. Given that the State attempted, but ultimately failed to accommodate either request, a reasonably skilled prosecutor could have strengthened the State's attempt to portray Davis as forthright by arguing she was testifying against Thompson *despite* such failures. Stated differently, although the letters indicated Davis was requesting favors in one instance to the point of threatening not to testify at Thompson's trial, her testimony notwithstanding that she did not receive those favors hardly would have helped Thompson's case.

*Thompson II* at p.20. The Indiana Court of Appeals observed that Davis's threats not to testify unless she was moved to another place of incarceration never came to fruition even when she was not relocated, concluding: "We are not convinced the evidence leads unerringly and unmistakably to a contrary conclusion" from the determination of the post-conviction court, namely, that Davis's letters do not satisfy the materiality standard. *Id.*

As noted above, "materiality" is one of the elements of a *Brady* violation. Materiality pertains to the issue of guilt or innocence. *United States v. Agurs,* 427 U.S. 97, 112 n.20 (1976). The materiality element of *Brady* does not require a demonstration that "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" but only that there is a "reasonable probability" of a different result. *Kyles v. Whitley,* 514 U.S. 419, 434 (1995). Moreover, materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Materiality is to be evaluated in light of the cumulative effect of the undisclosed evidence. *Id.* at 436.

Here, we agree that there is not a reasonable probability that the result of the trial would have been different had the letters been disclosed. Even though there was no physical evidence connecting Thompson to the murder, thereby heightening the importance of witness testimony, the letters would have contradicted Davis's testimony only as to the relatively minor issue of whether she did or did not request favors from the State, not even whether she received such favors, because she did not. Assuming the letter succeeded in impeaching her credibility to some extent, this issue does not bear directly on Thompson's guilt or innocence of the crime charged against her. Again, nothing before us indicates Davis received anything from the State in exchange for her testimony. *Thompson II*, at pp 9-10. The ruling by the Court on the post-conviction relief petition, as affirmed by the Court of Appeals, even if determined to be erroneous or incorrect, was not unreasonable and we are not authorized to enter habeas relief on any basis other than unreasonableness.

Thompson also claims that the prosecutor drew on witnesses' testimony which he should have known was false, while not apprising the defense of their dishonesty and claiming that the witnesses were motivated only by altruistic concerns. In *Giglio v. United States*, 405 U.S. 150, 153 (1972), the Supreme Court has extended the prosecution's disclosure obligation under *Brady* to encompass evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. The Indiana Court of Appeals recognized this standard, explaining that, "although the letters indicated Davis was requesting favors in one instance to the point of threatening not to testify at Thompson's trial, her testimony notwithstanding that she did not receive those favors hardly would have helped Thompson's case." *Thompson II* at p.20. Similarly, we do not view the Indiana Court of Appeals's conclusion as contrary to or an unreasonable application of *Giglio*.

A criminal conviction obtained through the prosecution's knowing use of perjured testimony violates a defendant's right to due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. at 103 (footnote omitted). Based on this principle, Thompson next claims that the State adduced false evidence at trial consisting of the testimony of Detective West who stated that no benefit had been given to or discussed with the informant witness, Gail Davis. Davis's testimony on re-direct examination was as follows:

> I never asked you for anything. I never once asked you to bring me a pack of cigarettes. I never asked for nothing. I never asked you for anything because I don't want anything from you.

*Thompson II*, at pp. 9-10 (quoting trial transcript).

Thompson maintains that both Detective West and Ms. Davis testified falsely and the prosecutor knew their testimony in these respects was false based on the information in Gail Davis's letters to the prosecutor. The judge inquired of Detective West during the trial: "With respect to some of the people you interviewed, particularly Pamela Nave, Rayetta Thomas, Davida Altmeyer and any other individuals, at any time did you as a police officer or law enforcement officer make any promises to them or indicate that they would receive any benefit for their answering your questions or assisting you?" Detective West responded, "Never." TR 449. When questioned by the prosecutor, Detective West answered that he was not aware of the prosecutor promising the witnesses anything in exchange for their testimony against Thompson. TR 450.

The Indiana Court of Appeals considered this claim as to Detective West's statements concluding as follows: "We fail to see how that [the State's failure to correct West's testimony because one of Davis' letter contains a request for a favor which the State tried to accommodate] makes Detective West's testimony false—he testified he never told any of the witnesses beforehand he or she would receive a benefit for testifying." In reaching this conclusion, the Indiana Court of Appeals correctly recognized the holdings in *Napue and Giglio* as controlling United States Supreme Court precedent. As such, we do not view its conclusion as to West's testimony and the State's failure to correct such testimony to be contrary to or an unreasonable application of, established federal law as determined by the Supreme Court.

Davis's repeated statement that she never asked for anything and that she never wanted anything from the prosecution does contradict the request she made in the first letter to the prosecutor, about which the Indiana Court of Appeals concluded that, "although Davis's first letter contradicted her testimony, we have already concluded that fact, if presented to the jury, would have been immaterial." *Thompson II*, at p. 22. The Indiana Court of Appeals noted in *Thompson II*, that "a defendant is entitled to a new trial if he can establish that the prosecutor intentionally or inadvertently failed to correct materially false testimony relevant to the credibility of a key government witness." *Ross v. Heyne*, 638 F.2d 979, 986 (7th Cir. 1980) (citing *Giglio* and *Napue*). Here, the Indiana Court of Appeals's conclusion that the State's failure to correct, whether intentionally or inadvertently, Davis's false testimony, while relevant to her credibility as a key government witness, was not material nor was it an unreasonable application of either *Giglio* or *Napue*. We cannot disagree with that properly reached conclusion

Thompson's final claim is that the State suppressed evidence favorable to the defense relating to two other witnesses, Pamela Nave and Davida Altmeyer, who received more lenient sentences in exchange for their testimony at her trial. Regarding Altmeyer's testimony, the Indiana Court of Appeals determined that, "Altmeyer may well have received a sentence that violated this statute,[4] but that hardly means the State procured such a sentence in exchange for favorable testimony. Accordingly, the post-conviction court's conclusion with respect to the plea agreements Altmeyer received is not clearly erroneous, which means the State did not suppress such evidence." *Thompson II*, at p.17.

The Indiana Court of Appeals reviewed Thompson's claim that the State suppressed evidence favorable to the defense that Nave also received a more lenient sentence, holding that:

---

[4] Thompson claimed that Altemeyer should have been sentenced to consecutive terms for a felony cocaine charge and a felony prostitution charge under Indiana Code § 35-50-1-2(d)(2): "If, after being arrested for one (1) crime, a person commits another crime … while the person is released … the terms of imprisonment for the crimes shall be served consecutively…."

> Thompson cites testimony and documentary evidence from the post-conviction hearing indicating that after the trial court informed the parties that Nave's sentence was nonsuspendable below two years, Detective West, at the request of Nave's counsel, told Kroh to contact the deputy prosecutor assigned to Nave's criminal case to inform him of Nave's "status as a witness in this case." Post-conviction Tr. at 23. (September 19, 2007, hearing). Kroh, however, testified that although he "very well may have" spoken to the deputy prosecutor about Nave, he lacked any "specific recollection." Post-Conviction Tr. at 66 (January 24, 2007, hearing).
>
> Several reasonable inferences can be drawn from this evidence. The first-the one Thompson urges-is that Kroh contacted the deputy prosecutor and told him to go easy on Nave because she was a witness, and that the deputy prosecutor in turn told Nave that he would let her plead guilty to Class D felony theft as opposed to Class C felony burglary because she was a witness in Thompson's case, implying that the State expected favorable testimony in exchange for the plea agreement. The problem for Thompson, however, is that this is not the only reasonable inference to be drawn from the evidence. On the one end, the evidence supports an inference that Kroh did not contact the deputy prosecutor at all (neither Kroh nor the deputy prosecutor remember (sic) discussing the matter) or, toward the other end, he might have contacted the deputy prosecutor, but the deputy might have offered the plea agreement to Nave without communicating his knowledge that she was a witness in Thompson's case, which undermines a conclusion that the plea agreement was in exchange for testimony. In that respect, we reiterate that the State's duty to disclose is triggered when the promise is in exchange for testimony. *See Rubalcada*, 731 N.E.2d at 1024. The post-conviction court declined to view Nave's plea agreement as an agreement in exchange for testimony, and given that the evidence supported several reasonable inferences in addition to the one Thompson urges, we cannot say the post-conviction court's finding is clearly erroneous. Accordingly, as with Altmeyer's plea agreements, we conclude Nave's plea agreement was not suppressed by the State.

*Thompson II*, at 17-18.

Because both Nave's and Altmeyer's plea agreements were not withheld from Thompson by the State, there was no *Brady* violation here. The Indiana Court of Appeals correctly recognized *Brady* as the controlling precedent, and we hold that

that conclusion was not contrary to, nor was it an unreasonable application of, clearly established federal law as determined by the Supreme Court.

### IV.  Conclusion

We have carefully reviewed the state record in light of Thompson's claims and have given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits. The deference due to state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington,* 131 S. Ct. at 786. Thompson's habeas petition does not present us with such a situation.

### V. Certificate of Appealability

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing ' 2254 proceedings, and 28 U.S.C. ' 2253(c), the Court finds that Thompson has failed to show: (1) that reasonable jurists would find this court's Aassessment of the constitutional claims debatable or wrong,@ or (2) that reasonable jurists would find Ait debatable whether the petition states a valid claim of the denial of a constitutional right.@ *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). We therefore **deny** the petition for habeas corpus as well as the issuance of a certificate of appealability.

**IT IS SO ORDERED.**

Date:  04/29/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel